1. RAPID TRANSIT COMMISSIONERS — CONFIRMATION OF REPORT — COST OF CON-
STRUCTION.
    On a motion to confirm the report of the commissioners appointed under the rapid transit act (Laws 1891, c. 4, and the several amendments) to adopt a route and general plan of a railway in New York City to be con-structed at the expense of said city, the court will consider the probable cost of the road; and, unless such cost has been ascertained by the com-missioners, the report will not be confirmed.

2. SAME—RIGHTS OF ABUTTING OWNERS.
    The owners of property abutting on the route selected by the commis-sioners have an interest in the determination of the question as to the cost of constructing the road, as they would be damaged if the work should be indefinitely protracted for want of funds, or should be abandoned after partial construction.

3. SAME—INCREASE IN VALUE OF PROPERTY AFFECTED.
    In determining whether the cost of construction will be within the lim-its of the indebtedness which may be incurred by the city, the court can-not consider the increase in the value of property which will result from the construction of the road, as such increase will be a matter of time, while the liabilities of the city must be incurred forthwith.

Application by the board of rapid transit railroad commissioners of the city of New York for the appointment of commissioners to determine and report whether a rapid transit railway, for the con-venience of transportation of persons and property, as determined by said board, ought to be constructed and operated. The commis-sioners were appointed as provided by the rapid transit act (Laws 1891, c. 4, and the several amendments thereof), and the board moves to confirm their report. Denied.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, WILLIAMS, and INGRAHAM, JJ.

A. B. Boardman and E. M. Shepard, for the motion.

Elihu Root, Franklin Bartlett, George Zabriskie, G. G. De Witt, J. A. Murray, and Ezra A. Tuttle, opposed.

VAN BRUNT, P. J.   The board of rapid transit commissioners· having adopted a route and general plan, and having failed to obtain the consent of the property owners along the line of the proposed railways, made application to the general term for the appointment of commissioners as provided for in the rapid transit act; and on the 15th of November, 1895, the general term appointed three commissioners, to determine and report, after due hearing, whether the railway determined upon by the said board, and mentioned in their petition, ought to be constructed and operated.   These commissioners, having proceeded with the hearing of the matters referred· to them, on the 6th of March, 1895, reported to this court that they were of the opinion, and thereby determined and reported, that the route proposed by the board of rapid transit commissioners ought to· be adopted, and that the railway determined upon by said board ought to be constructed and operated.

The commissioners, after spending months in the taking of testimony in regard to the question of the cost, and the manner of building and operating the railroad in question, and having frankly stated, in their report, that any conclusion which they could arrive at in respect to the probable cost would be mere conjecture, seem to have· cut the Gordian knot by setting aside entirely the question of cost, and looking upon the questions referred to them solely as engineering problems.   It is the first time, we think, in the history of any great enterprise, that the question of practicability did not include· the consideration of cost.   More than 1,800 years ago it was said:

"For which of you, intending to build a tower, sitteth not down first, and counteth the cost, whether he have sufficient to finish it?   Lest haply, after he hath laid the foundation, and is not able to finish it, all that behold it begin to mock him, saying, 'This man began to build, and was not able to finish.'"

If the question of cost was not to be considered by these commissioners, it is difficult to see what question was before them.   The legislature and the people had both spoken very emphatically upon the question of the desirability of rapid transit, and it is well known that there is no problem which engineering science cannot solve, provided there are dollars enough behind it to meet the expense.   But it is urged, upon the part of the movers of this scheme, that the property owners cannot raise the objection as to cost, because they have no interest in the determination of that question.   It is apparent that this is a fallacy.   The only justification which can probably be· urged, to sustain the interference with the use and access of abutting owners to their property which the construction of this railroad will necessarily involve, is that it can and will be completed within a reasonable time after its commencement.   If there is a probability that financial difficulties will be met, and the construction of this road will drag its weary length along for a time which no man can compute, and possibly its construction be absolutely

abandoned because of the wreck of the city's finances and the inter-vention of constitutional prohibitions, it is manifest that great in-jury will result to the property of abutting owners for which they can never be compensated.

In reaching the conclusion arrived at, the commissioners appointed by this court seek to justify themselves by reference to the language of the general term when a former scheme of rapid transit was be-fore it. In so doing they seem to have lost sight of the fact that the plan now seeking our sanction differs in every feature from the one which was then before the court. In the case formerly before the general term, all that it was necessary for the commissioners to do, to protect the city and the abutting owners, was to take such security as would enable the city to fill up the hole made in the course of the work in case the contractor failed to comply with his contract. The court was of the opinion that the question was sim-ply a financial one, and that it might safely assume that the com-missioners would take sufficient security, at least, to put the street in its then present condition, in case of the failure of the contractor to complete the work, and that, if capitalists would at their own risk undertake the enterprise, they should be allowed to do so. In the case at bar, however, the problem is absolutely different. It is the city's money which is to be spent; and it is to be observed that, in view of the obligations already incurred by the city for work in prog-ress, it is difficult to see how money can be provided to meet even the engineers' estimates of the cost of this work, in consequence of the constitutional prohibition against the creation of debt; and, if the work was commenced, it would be impossible for the city to raise funds necessary for its completion, and the work must cease, al-though incomplete and absolutely useless.

It may be said, and it is said, that it is to be presumed that the commissioners will take sufficient security from the party contract-ing with the city to construct this railway upon its behalf. But, if our commissioners cannot tell whether this railroad can be con-structed for $50,000,000 or $90,000,000, after spending months in in-vestigating this subject, as they have reported, upon what basis are the rapid transit commissioners to fix the security? It has been also suggested that the increase in the value of property will give an enlarged opportunity to create a debt; but this increase will be a matter of time, and the contracts for construction must be made now, the obligation must be entered into now, and it cannot be done in sections. Consequently, the now debt limits can only be consid-ered.

It is to be observed that the moneys for this enterprise must be furnished by the city, and the risk is really that of the city; and it would seem, having in view the other obligations of the city, unless the road can be built for a substantially less amount than the en-gineers' estimates, the work must stop, and the city would not have the right to borrow money enough to put the streets in the condi-tion in which they were before it had sunk its fifty-odd millions of dollars in a vain attempt to carry out this scheme of rapid transit. If our commissioners are unable to ascertain within $40,000,000 what

this enterprise is to cost, would not be the height of folly to enter upon this construction, knowing as we do that, without any exception, the cost of every great public work has far exceeded the estimate of the engineers?    We have, for example, the Brooklyn Bridge, estimated cost $8,000,000, actual cost, $16,000,000; the New Aqueduct, estimated cost $14,000,000, actual cost $24,000,000, with from $6,000,000 to $8,000,000 more of claims which the aqueduct commissioners had incurred, but which the city escaped the payment of only because of the prohibitory character of the legislation on that subject.    We have no reason to assume that the rapid transit commissioners will be more careful of the public interest than were the Croton Aqueduct commissioners.

In a great work, like the one proposed, it is impossible to foresee all contingencies; and, as the rapid transit commissioners have averred their intention to go as far as the debt limit will allow in the making of their building contract, there will be no question but that the boundary will be overstepped, because of the very nature of the enterprise.    Besides, by the terms of the act, the city is bound to indemnify the contractor against many and divers things as to the expense of which no estimate can be given.    The act provides that the city shall secure and assure to the contractor the right to construct and operate, free of all rights, claims, or other interference, whether by injunction, suit for damages, or otherwise, on the part of any owner, abutting owner, or other person,—a condition absolutely impossible of fulfillment.    How is the city to prevent interference with the work by injunction?    That question lies with the courts, and not with the courts of this state alone; for there are cases, without doubt, in which the courts of the United States would have jurisdiction to act, and when such jurisdiction exists they have not hitherto shown much reluctance in acting.    The rapid transit commissioners have no power to fetter the action of the courts, and they have no right to deprive the contractor of this provision of the law by any restrictions in the contract.    That legal proceedings will be undertaken which will, to some extent, at least, interfere with the progress of this work seems to be inevitable; and, if delayed by these, which the city cannot prevent, the contractor might be relieved from his contract with the work half performed, and the city have no recourse against his sureties.    There is no restriction upon the rapid transit commissioners as to the amount they can render the city liable for,—a power never before given to any board or body, —and they may involve the city in an amount of obligation which would absolutely ruin and destroy its credit, and bring about as great a disaster as was occasioned by the collapse of the Panama Canal, and all other public improvements would necessarily be stopped.

It has been suggested that, under the provisions of section 34 of the rapid transit act, the board of rapid transit commissioners is empowered to contract for the construction of the whole road, or all the roads provided for by their plans, in a single contract, or may by separate contracts, executed from time to time, provide for the construction of parts of said road or roads, or for the construction at first of two or more tracks over a part of such road or roads, and

afterwards of one or more additional tracks over a part or parts of such road or roads, as the necessities of said city or the increase of its population may in the judgment of said board require; and that, under this power, the commissioners may delay the construction of sections of the road until the assessed valuation of the real estate of the city shall increase to such a sum as would allow the incurring of additional indebtedness upon the part of the city over and above that which is now permitted by the constitution. In respect to this suggestion, it would seem to be sufficient to say that the subsequent provisions of the section in question appear to be inconsistent with the right to make entirely separate contracts, because they require that the contract of construction should also provide that the person, firm, or corporation so contracting to construct said road or roads shall, at his or its own cost or expense, equip, maintain, and operate said road or roads for a term of years to be specified in said contract. Hence, if the road is to be constructed in sections, there must be sectional provisions in regard to operation, and the system would be anything but uniform, and uniformity is an absolute necessity. This necessity is contemplated by the provision subsequent to that first quoted, in which it is said that the board may also, in a contract for a part of such road, insert a provision that, at a future time, upon the requirement of the board, the contractor shall construct the remainder, or any part of the remainder, of said road, as the growth of population or the interests of the city may, in the judgment of the board, require, and may, in such contract, insert a provision of a method for fixing and ascertaining, at such future time, the amount to be paid to the contractor for such additional construction, and, to the end of such ascertainment, may provide for arbitration, or for determination by a court of the amount of such compensation, or of any other details of construction, which shall not be prescribed in the contract, but which shall be deemed necessary or convenient by said board. If this power is resorted to, the obligation is created at the time of the original contract, the ascertainment of its amount only being deferred, and hence it comes within the present prohibition of the constitution.

It is to be further observed that the sectional plan assumes that the board of rapid transit shall mortgage for a considerable period of years in the future the debt-creating capacity of the city. Under this scheme it would be impossible for the city to provide for the purchase of land for the building of public schools, the improvement of docks, the furnishing of additional water supply, and the establishment of additional parks,—all improvements of a permanent character, payment for which may properly be provided for by bonds to be payable in the future,—and the city would lie helpless, bound hand and foot by this octopus of debt created by the rapid transit contracts. It will undoubtedly be claimed that this is an exaggerated picture of the situation, but the disposition seems to be to enter upon this enterprise regardless of and in utter ignorance of the cost, trusting to the distant future to help the enterprise out of the difficulties by which it is admittedly surrounded. This blind confidence we are unable to indorse, in face of the adverse finding of our

commissioners as to what we think is the crucial fact governing the disposition of this case.   They say, after examining the question of cost, that any estimate they could make would be very like conjecture.

With these facts staring us in the face,—these results almost certain to ensue,—how can it be said that this enterprise ought to be commenced?   The probabilities indicate that, after sinking $51,000,-000 in it, without being able to complete it, the enterprise would have to be abandoned, since no legislation could afford any relief.   "All that behold it would begin to mock, saying, 'This city began to build, and was not able to finish!'"

The motion should be denied.   All concur.

RUMSEY, J. (concurring).   In the examination of the questions presented in this proceeding, it must be conceded that some system by which people may be rapidly and conveniently transported from one extremity of the city of New York to the other, is desirable, and would be convenient.   Such is the judgment of the legislature, as evidenced by the statute pursuant to which this proceeding is taken, and fortified by the judgment of the common council of the city. This conclusion is strengthened by the vote of the people, to whom was submitted the question whether a system of rapid transit should be undertaken.   It must be remembered, though, that, when the question was presented to the people, the present scheme had not been devised, and that the plan upon which the people expressed their minds was very much different from this one, involving a different route, a different system of construction, and a very grave difference in the liability which the city should assume.   The vote of the people, therefore, on that subject, while it may be construed as an approval of some scheme of rapid transit, is not to be taken as an adoption of the particular scheme which is presented here.

Laying aside all constitutional questions, the matter is presented to us in a purely business aspect.   The situation of the city is such that healthful and convenient places of residence which are within the reach of persons of moderate means can be secured by them only in the upper portion of the city, and at a great distance from the places of business of many of them.   The proposition is to devise some practicable scheme by which these people may be transported conveniently, safely, rapidly, and at small expense, from their homes in the extreme upper portions of the city, to their places of business at the lower end of the city; and it is believed that such a scheme, if it can be operated, will enhance the wealth of the city, and increase largely its desirability as a place of residence.   It is manifest that, to carry this scheme into effect, it is necessary that some means should be devised by which the whole length of the city shall be traversed.   It will not do to terminate the proposed road at any point short of the upper limits of the city, because it is there only that room can be found for the dwelling places of those who are most interested in the adoption of this scheme, and for whose convenience it is principally intended.   The numerous systems already in operation are sufficient for the transportation of those whose pla-

ces of residence are below the upper limits of the city, and while those systems are not sufficiently commodious to permit the passengers who are carried by them to travel conveniently at all hours of the day, yet they are undoubtedly sufficient for the absolute needs of the community in the central portion of the city.    Therefore, no system of rapid transit will be useful or meet the wishes of the people unless it shall traverse the whole city, and connect one end with the other.

Such being the requirements, the first question is, what is the city at liberty to do by way of meeting the necessities of the case?    The duty of the authorities in that regard is laid down clearly by the statute.    In the first place it is the duty of the city to construct such a system of rapid transit; to appropriate and raise the necessary money to put it in condition for operation, at least, whatever the expense may be; to acquire the fee of such land as may be necessary to erect power houses and store cars, and for all other purposes of the proposed road; to acquire such privileges, terms, and easements as the operation of the road shall make necessary; and to do this at its own expense.    To that end, after some satisfactory plan shall have been devised, the board of rapid transit commissioners, representing the city, is required to make a contract with some corporation or individual by whom the railroad thus planned shall be completed.    This corporation, after having completed the road, is to operate it for a term not less than 35 years, with a contract for its renewal from time to time indefinitely.    As has been said, the city is to pay for the construction of this road.    Not only that, but it is compelled by the law to provide in the contract that the city shall secure and assure to the contractor, so long as the contractor shall perform the stipulations of the contract, the right to construct and operate the road as prescribed in the contract, "free of all right, claim or other interference, whether by injunction, suit for damages, or otherwise on the part of any owner, abutting owner, or other person."    Laws 1895, p. 901.    This obligation on the part of the city is absolute, and the extent of it it is difficult to estimate.    The board of rapid transit commissioners have devised a scheme for the construction of the road, have procured the consent of the common council of the city, and, upon the failure to obtain the consent of a majority of the abutting owners upon the street through which it is proposed to build the road, they have applied to this court to obtain its consent to build the road.

Right here it is necessary to determine what duty is laid upon this court, and what considerations should affect it in concluding whether or not its consent should be given.    The statute says that, if the consent of the property owners cannot be obtained, three commissioners shall be appointed by this court, and if they, after hearing interested parties, shall report that such railway ought to be constructed or operated, their report, when confirmed by this court, shall be taken in lieu of the consent of property owners.    Sections 4, 5. Manifestly, the duty of the court is to consider whether the railway proposed should be constructed.    This duty is not merely formal and perfunctory.    It involves inquiry into all the facts, and requires

a consideration of grave questions of expediency and public policy. In re Kings County El. Ry. Co., 82 N. Y. 95. We are not permitted to examine into the advisability of any general scheme of rapid transit, for the expediency of that has already been decided upon. We are to say whether, upon all the facts made to appear before us, the scheme presented is feasible and within the limit of the power of the city, and so likely, upon the whole, to be for the benefit of the city that the railway should be constructed in spite of the refusal of the property owners to give their consent. That consideration involves an examination into the nature of the scheme, the time probably necessary for its construction, the probable cost, whether or not the expense is within the means which the city has at hand to pay, and whether, upon the whole, considering all the advantages and disadvantages presented, the particular scheme is one which it is within the power of the city to carry into effect, having in view other imperative calls upon the city treasury, and which, when carried into effect, will be likely to afford the advantages which are expected from such a construction. In this consideration, we are to throw out the question of profit to the city. By the terms of the contract, the city is not expected to receive any profit from the operation of this road. The benefits which it must derive are entirely consequential, and such as arise from the increased convenience to great numbers of its inhabitants, and the probable enhancement of values in property in certain portions of the city. The only money which the city is at all likely to get directly from the operation of the road is the annual interest upon a certain portion of the bonds which it is required to issue, and 1 per cent. per annum in addition for a sinking fund, to be payable after a certain time. It is quite clear that the sum to be paid to the city will not recompense it for the interest upon the bonds which it is to issue. Those bonds are to bear interest at the rate of $3\frac{1}{2}$ per cent. per annum. The rental is to be estimated, not upon all the bonds which shall have been issued, but upon such of them as shall be left after deducting the bonds which have been issued to pay for rights, terms, easements, privileges, or property other than lands, acquired in fee. So that it will be seen that the amount of bonds issued by the city will be very much larger than the total amount of those upon which the interest by way of rental shall be paid. In addition to that must be considered the sum which the city may be compelled to pay by reason of its liability for interference and damages spoken of above, the amount of which cannot be estimated. It is quite true that the amount above mentioned is the minimum rental which can be exacted; but, in view of existing conditions, it is clear that no greater sum can be obtained. Indeed, since this case was argued, an amendment to the statute has practically authorized the commissioners to contract for a less rental. For the same reason the 1 per cent. for a sinking fund to be paid on a portion of the bonds is certain to be very much less than 1 per cent. on the whole body of the bonds; so that the amount of the sinking fund will be very small in proportion to the whole amount of the bonds. It is to be noticed, too, that the contract provided for in the statute is so arranged that, if the

company defaults in its agreement to operate the road, and the city is forced to take possession of it, it can never get, by means of the operation, anything more than the 4 per cent. upon the prescribed amount of bonds, and the 1 per cent. upon the sinking fund, because, by the express terms of the statute, anything in addition to that above the expenses of the operation is to be paid to the company, and not to go to the benefit of the city.    For that reason, the element of the probable profit to the city in the building of this road must be excluded from the calculation.

The plan, as devised, has in view an underground railroad, extending from Battery Place, through Broadway, to Fourteenth street; thence dividing, one branch extending up Broadway, and under the Boulevard, to 185th street, and on the east side extending from Fourteenth street, through Fourth and Park avenues, to Motthaven. It will be noticed that neither scheme has in view the extension, at present, of either branch of the road to the city limits, but each branch stops several miles short of them.    This constitutes, of course, a serious defect, but not necessarily one by reason of which it could be said that the road ought not to be built.    The selection of a plan for an underground railroad cannot be complained of.    The engineers seem to agree that it presents no insurmountable engineering difficulties, although a railroad constructed in that way will undoubtedly cost very much more than one built upon the surface of the ground.    But the rapid transit commissioners have concluded that, upon the whole, taking into consideration the fact that a road so constructed, when finished, will not be liable to interruptions, will be entirely free from danger of collision with vehicles, will leave the street above open, and can be operated at high speed with comparatively few inconveniences, the advantages of it more than compensate for the increased cost and probable delay in construction. It is undoubtedly true, and it seems to be conceded, that a road thus constructed will not be as convenient in some respects for passengers, and certainly will not offer as many attractions to them, as one built upon or above the surface of the ground; but it must be remembered that such a road is built for use, and not for the enjoyment of the passengers, and if it would serve its purpose in affording means of rapid transit from one end of the city to the other, the minor inconvenience can well be borne.

We must bear in mind, however, that this underground road is to be constructed along the busiest street in the city of New York, which constitutes the main highway of the city, which is constantly thronged with vehicles and foot passengers, which is lined with costly buildings, especially at its lower end, the rental value of which is very great, and that this construction will undoubtedly require a considerable time, and that, during that time, passage and commerce upon this great highway will be seriously inconvenienced.    It has been claimed that, in fact, the street will be practically closed during the time that the railroad is constructing.    It is stated by the engineer of the railroad company that a mode of construction can be adopted which will prevent that calamity; but the fair inference from his testimony is that, if such a mode of construction is

adopted, the cost of the road will be increased by a very large amount of money, so that, upon the whole, it seems quite improbable that, having in view the amount which is at the disposal of the city, it would be practicable to use those means in the construction of the road which would be necessary to enable the foot passengers and vehicles to go up and down Broadway while the excavation was going on under them.   If this be true, and it is fairly to be inferred from the evidence, it would follow that, while the road was in process of construction, the business done upon this street would be very seriously diminished, and, of course, that would cause a very great loss, both in the business profits and in the rental value of buildings to the people whose places of business lie along that street.   When it is remembered that the evidence is that it will require upward of three years, working night and day, to complete this road, upon this plan, from Battery Place to Fourteenth street, and five years to complete it to Thirty-Fourth street, it will be seen that the amount of this loss is hardly susceptible of computation.   This, of itself, of course, is no reason why the road should not be built; but it is a matter to be seriously considered in deciding whether it should be built or not.   It appears, from the testimony, that the construction of this road to Thirty-Fourth street will, under the most favorable circumstances, occupy not less than five years, if built in the manner proposed.   This involves a loss of interest of several millions of dollars, and adds very largely to the necessary cost to the city in completing the enterprise, not to mention the considerations of the inconvenience to which the inhabitants of the city, and especially the business men, upon the street along which it is to be built, will be put.   The length of time must also be considered, because of the possibility that the contractors may not be able to finish the road at all, and the city may be left with an unfinished road upon its hands, and with its great thoroughfare practically destroyed for use.

But the most serious question is that of cost.   We do not agree with the counsel for the board of rapid transit commissioners that this is a matter with which the court has no concern.   As we have seen, in concluding whether this road ought to be built, we must take into consideration all the facts, and the matter of its expediency, and also the question of public policy.   Such is the determination of the highest court of the state, and, in the consideration of those questions, the probable expense to which the city will be put is an important, if not a decisive, factor.   The question has never been presented to the court upon any other application.   All other street railroads have been built by private corporations.   The matter of cost, to them, was a mere matter of profit or loss.   If they miscalculated, the result was simply that the road was left unfinished, and that some other company could be organized to go on and finish it.   There is no limit to the amount that might be expended, except the limit of possible profit.   Whether the work was done or not, no great public inconvenience could result, because the necessity of restoring the street, so far as it was rendered impassable by the work, was a matter of small moment, and a thing which could easily be provided for.   In this case, the conditions are very different.

The cost is to be incurred by a municipal corporation, which is not at liberty to expend an unlimited amount of money or to incur unlimited obligations. Its right to incur obligations is limited by the constitutional prohibition, and its capacity to raise money is controlled by the necessary expenses of the municipal government, and by the unwillingness of the people to endure oppressive taxation. If there should be a miscalculation in the cost, so that the contractors would be unable to finish the road, or to comply with the terms of their contract, the city would have no remedy except to insist upon the forfeiture and the guaranty bond which the statute provides. As every one knows, such things, in such an exigency, would be but a broken reed, and it would be almost certain that the city would be compelled either to permit the work to be unfinished or to pay the expense of finishing it by direct taxation, in view of its inability to borrow money after it had reached the constitutional limit of its indebtedness. No careful business man would undertake any enterprise under these circumstances, unless he had counted seriously the cost of the enterprise, and had become satisfied of his ability to meet the expense, whatever it might be.

It is quite true that the statute permits the rapid transit commissioners to contract for the construction of a part of this railroad at one time, and does not compel them to provide by a single contract for the finishing of the whole road. But it is not to be supposed that the board would take advantage of this provision unless it were absolutely necessary to do so, because the scheme only becomes useful when it shall be fully completed, and it is quite clear that an underground railroad extending only through the lower portion of the city of New York, and having close competition with the surface roads, which, during the greater portion of the day, are of more than sufficient capacity to carry the passengers, would be a complete failure; and if they do decide to build the road in sections, none the less must they incur the whole obligation when the contract is first made. However much the construction of the road may be delayed, the question is whether the whole road shall be constructed, and not whether the court shall give its consent to the construction of a portion of it. While we must and do assume that the board of rapid transit commissioners will do what, in their judgment, is best for the interests of the city, yet we must also assume that they will proceed as rapidly as possible to the construction of this road for the whole length for which it is planned; and, when our consent is given, it is with the understanding, of course, that that is what was intended.

In considering this question of cost, the first thing that impresses us is that, after all the investigation which the court commissioners made upon the subject, they were entirely unable to come to a conclusion as to the probable expense. In view of the extremely contradictory nature of the testimony, and of the fact that the scheme itself has not been sufficiently worked out to enable the engineer having it in charge to say precisely what the expense of it will be, that is not at all strange. But the effect of it is to require us to examine the more carefully into the case, and conclude whether there is any reason to believe that this road, or so great a portion of it as would

be of advantage to the city, by the expenditure of any sum which the city can pay, can be constructed. . We have examined with care the testimony upon this subject.   We are met, at the first, with the fact that the whole scheme, as presented for our consent, is tentative; that the details are not worked out; that even the mode of making the excavation, which is by far the greater portion of the expense, is not entirely settled upon.   As to many of the questions which should be answered to enable the cost to be estimated with any accuracy, we are left entirely in the dark.   For instance, with regard to the amount of the underpinning and shoring of buildings which may be necessary in the lower part of Broadway, there is a serious and distressing conflict of testimony, which would indicate that the matter has not been examined with sufficient care.   This single item may add hundreds of thousands of dollars to the expense of this excavation.   Indeed, the cost of the excavation itself is entirely unsettled.   In the nature of things, it cannot be settled.   That cost depends, of course, upon the depth at which this tunnel is to be run, and that depends upon the depth below the ground at which the tracks are to be laid, and the disposition which is to be made of the constructions now existing in the street.   As we understand the testimony, the depth at which the tracks are to be laid beneath the street is not settled, and the plan presented is only tentative, and liable to be changed if any change should be discovered in the conditions which have been supposed to exist.   This change may add largely to the expense of the road.   There are many other considerations, from which it appears that the probable expense of this road has not yet been estimated with any approximation to accuracy. In examining the testimony upon this subject, we find that the lowest estimate is that made by the engineer of the rapid transit commissioners.   That estimate is something over $49,700,000.   The estimate of the board of experts, which is furnished to us, for the construction of the road between the same points, is $50,000,000.   On the other hand, we have the estimate of Mr. O'Rourke who says that, in his judgment, the cost of the road, excluding the interest upon the construction, will be something over $79,500,000.   While we cannot adopt this last estimate in all its entirety, yet a careful comparison of it with the other two estimates satisfies us that it is worthy of consideration, and that the actual cost is likely to be much greater than that estimated by the consulting engineer of the board.   Indeed, that is the history of all great public and private enterprises, no matter how carefully planned or how honestly carried out.   It needs no reference to particular instances to satisfy every intelligent man that architects' and engineers' estimates of any work, whether building a house, constructing a railroad or an aqueduct, or any great public improvement, are always sure to largely fall short of the actual and necessary cost.

But, assuming that the cost of this enterprise shall be only that which is estimated by the engineer for the rapid transit commissioners, that amounts, in round numbers, to $50,000,000.   He makes no estimate for the payment of damages, or for the expense of acquiring property in fee for the incidental uses of the road; nor does he make,.

as, indeed, he could not make, any estimate whatever for the contingent liability of the city arising out of its requirement to agree to secure and assure to the contractor the right to construct and operate the road, free of all right, claim, or other interference, whether by injunction, suit for damages, or otherwise, on the part of any owner, abutting owner, or other person. The extent of that liability may be something appalling. It cannot be estimated, but it must be taken into consideration in coming to a conclusion whether, upon the whole, the city ought to undertake a work carrying with it the possibility of such serious financial burdens. If, however, as we said, we take simply the estimate made by the consulting engineer, and add to that the $5,000,000 of bonds which must be issued to pay for the acquisition of property, as provided by section 37 of the act, there at once arises the necessity of issuing upwards of $55,000,000 of bonds. It is plain that the city is not now in a situation to incur any such indebtedness. The assessed valuation of the city is something over $1,646,000,000. The actual debt now existing, not including outstanding obligations, is something over $109,000,000. The limit of the constitutional power to incur indebtedness is $164,600,000, leaving, as an amount of indebtedness which the city may incur above its present debt, $55,000,000. But we are bound to know that outstanding obligations have consumed a considerable portion of that amount. The bonds which the city must issue for obligations already incurred is upward of $19,000,000, which would leave only $36,000,000 that could be issued for this purpose. It is conceded, on all hands, that such a sum is entirely insufficient for the completion of this work. But, if even that amount of bonds should be issued, thus bringing the indebtedness of the city up to its full limit, there is no doubt that the results might be quite serious. From that time on, all expenses, however onerous, could be met only by taxation. In whatever public enterprise it should be necessary to engage, from any unforeseen exigency which might arise, there would be no power to incur any indebtedness, however useful the existence of such a power might be. If it should be necessary to build schoolhouses, or to improve the water front, or to repave a street, each of those things could be done only upon condition that the money to pay for it should be at once raised by taxation. The serious consequences of such a condition of affairs can easily be understood. The actual necessity of leaving some margin of the power to incur indebtedness, so that the city may provide for unforeseen emergencies, must be conceded, and the propriety of undertaking any enterprise which would take away that power must be questioned seriously. But if, as is quite possible, the work should prove considerably more expensive than the estimates, the consequences would be much more serious. In that case, undoubtedly, the work must stop, or it could be continued only by a resort to direct taxation to pay for it, which, added to the necessary taxation for the expenses of the city government, might be exceedingly oppressive. If taxation should not be resorted to, the necessary result would be that the work would come to an end, and probably the money already invested would be totally lost.

It may be said that this is altogether too somber a view to take of this affair; but the answer is, as has already been said, that the history of such enterprises is uniform in showing that the estimated cost always falls short of the actual expense of construction, and, in looking at a business matter, a wise business man will always take into consideration the most unfortunate condition that might occur, in order that he may be prepared for whatever shall happen. If it be said that the natural increase of values in this city will be such as, within no long time, to permit a great increase in its debt, the answer is that we are dealing, and must deal, with existing conditions. The necessity of contracting indebtedness goes hand in hand with the increase in the power to do so. When one examines into the propriety of engaging in any enterprise which will not yield him a substantial profit, such as this one is, he should consider, not what may possibly occur in the future, but what is the present condition of affairs, and whether that condition will warrant him in incurring the liability which he is about to assume. Any enterprise which might, or even may, seriously impair the credit of this city, or heavily burden the taxpayers, is not to be undertaken without grave misgivings. An extraordinary exigency must exist to justify the authorization of any such thing. In our judgment, that exigency does not exist with reference to this road. While the convenience of a system of rapid transit must be conceded, and while it cannot be denied that the desire for it has been expressed by the municipal authorities and by the people, yet, in view of all the considerations which have been presented to us, we are of the opinion that it would not be proper for us to consent that the city shall undertake the building of this road, upon this particular plan, at this time, in view of the fact that the road, when built, will not furnish a complete system of rapid transit from one end of the city to the other, that it is doubtful whether any large portion of it can be built with the money now at the disposal of the city, and that it is certain that the expenditure of the vast sum of money even now authorized by the legislature will take away the power of the city to engage in any other public work, however necessary, and may possibly so impair its credit that it will not be able to recover in the course of many years. All concur.