(114 App. Div. 379.)

In re BOARD OF RAPID TRANSIT RAILROAD COM'RS· OF CITY OF NEW YORK.

(Supreme Court, Appellate Division, First Department. July 12, 1906.)

1. STREET RAILROADS—ESTABLISHMENT—ACQUISITION OF RIGHTS.

Laws 1906, p. 1573, c. 607, amending the rapid transit act (Laws 1891, p. 19, c. 4, § 37), provides that, on refusal by property owners to consent to proposed subway routes as laid out by the rapid transit commission, application may be made to the Supreme Court, and that a confirmation by the court shall be equivalent to the consent of property owners. Applications relating to 19 different routes were made, and there were before the court 11 routes on which favorable reports had been made, and confirmation of which was sought; but it appeared that there was no purpose to immediately build all the routes, and that the 19 routes would cost $450,000,000, while under the constitutional restrictions the total borrowing margin of the city, most favorably viewed, did not exceed on January 1, 1906, $61,000,000. *Held*, that owing to the financial conditions, and owing to the fact that private capital could probably not be obtained to any considerable extent under the law, and owing to the effect that confirmation would have on the property involved, the routes would be confirmed only on condition that the rapid transit commissioners decide within two years which of them to construct.

2. SAME.

Laws 1906, p. 1573, c. 607, amending the rapid transit act (Laws 1891, p. 19, c. 4, § 37), provides for a public hearing on the terms and conditions of the contract, at which citizens shall be entitled to appear and be heard, and by other provisions of the section no contract can be made until the board of estimate and apportionment shall have consented thereto. *Held* that, on a motion to confirm the reports of the commissioners upon proposed subway routes, the court would not impose conditions as to the terms and conditions of the contract.

Judicial proceedings on the application of the board of rapid transit railroad commissioners for the city of New York for the confirmation of the report of the commissioners on the proposed Third avenue route and 18 others.   Motions to confirm the reports under the rapid transit act.   Reports confirmed, subject to certain limitations.

Argued before O'BRIEN, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and HOUGHTON, JJ.

George L. Rives and Albert B. Boardman, for the motion.
Martin W. Littleton and William Byrd, opposed.

O'BRIEN, P. J.   The rapid transit commission, under the law, has laid out the general plan of subway routes which have received the approval of the board of estimate and apportionment, but for which the consent of the property owners along the proposed routes could not be obtained.   It is provided by law that, upon the refusal by property owners to consent, application may be made to this court for the appointment of commissioners, whose duty it shall be to

pass upon and determine whether or not such consent should be given, and their report, when favorable, if confirmed by this court, is equivalent to the consent of those owning property along the lines of the proposed route. In all, 19 applications relating to 19 different routes were made, and commissioners were appointed, and we have now before us some 11 routes in which the commissioners have made favorable reports, and we are asked to confirm them.

The function, duty, and powers of the court in these proceedings have been the subject of judicial construction, and we deem it unnecessary to add to the views expressed by this court in Matter of Rapid Transit Com'rs, 15 App. Div. 290, 39 N. Y. Supp. 750; Matter R. Transit, 23 App. Div. 472, 49 N. Y. Supp. 60; Sun Pub. Co. v. Mayor, 8 App. Div. 233, 40 N. Y. Supp. 607. These sufficiently indicate that our function is not merely perfunctory or formal, but that a grave responsibility rests upon the court in passing its judgment upon what is the most stupendous scheme of municipal improvement and expenditure ever undertaken, and without a parallel in its ultimate bearing upon the destiny of the people of what we have reason for thinking will be the greatest city of the world. It is agreed on all hands that transit facilities should be furnished as speedily as possible, and that the extent of the facilities to be furnished should, in some degree, be proportionate to the rapid growth of our population throughout the greater city. Upon the question of the present necessity for all of the routes proposed, we find no grounds for differing from the conclusions reached by the rapid transit commissioners; and, were there no other questions involved, our duty would be simple and plain.

There is, however, involved another and very serious feature, and it relates to the financial ability of the city to undertake the proposed construction. It is shown by the record before us in the Third Avenue Case that the 19 routes of subway will cost $300,000,000 for construction, and $150,000,000 for equipment, or a total of $450,000,000. Under the restriction imposed by the Constitution, the total borrowing margin of the city, most favorably viewed, did not exceed on January 1, 1906, $61,000,000. If we can look at the future, there is a likelihood, in view of the increased values of property, that the city will have a debt-incurring capacity between the 1st of July, 1906, and the 1st of January, 1907, of something like $110,000,000. And, if all of it were appropriated for rapid transit construction, there would be nothing left for the other departments of the city government, which in expense and importance are increasing and expanding from year to year. No doubt, in the future, with the growth of values, the assessments on property can be considerably increased, and thus the borrowing capacity of the city can be enlarged; but a policy which would seek to unduly add to burdens of the taxpayer, or which would seek artificially to create values, would be more fatal, in our judgment, to the true and right development of our city than the failure to provide transit facilities.

The vote of the people in 1894 that subways should be constructed with public funds, and the recent legislation limiting the terms of the lease which it is in the power of the commissioners to make, render

it problematical as to what extent private capital will be attracted to undertake the construction of future subways, if permissible by law, upon which question, because not before us, we express no opinion. In the subway built, the city advanced for construction more, as the event proved, than was absolutely necessary for construction proper, and this excess was available to the contractors, who were bound and from their own funds agreed to advance the moneys needed for the equipment and operation of the road.   The feature, however, that was undoubtedly most attractive to bidders was the lease obtained for a period of 50 years.   Under the Elsberg bill, the lease of subways is limited to 20 years; and, although there is a provision that the city can lease it for a further term of 20 years, it is upon condition that the city can agree upon the terms of the second lease, which leaves it practically optional with the city, and gives the first lessee no assurance of more than a single term of 20 years.   How far this may affect the intervention of private parties in the enterprise, we need not at present inquire, because, as the law now stands, the commissioners must look to the city for the funds needed to undertake the construction of these subways.

We are thus brought back to a consideration of the most serious question as to the financial ability of the city and its bearing upon the approval which is sought from the court.   Upon the record before us it appears beyond the possibility of doubt that the city has not the financial ability, at the present time, to undertake the building of all of the routes proposed, and the only effect of our approval will be practically to completely appropriate and tie up every thoroughfare leading into and through Manhattan borough.   There is force, therefore, in the contention made by the counsel for the taxpayer, who opposes the confirmation, that:

"If the court at this time approves and confirms the proposed routes, it concludes and estops for all time to come its opportunity—nay, its duty—to protect, oversee, and supervise the complex interests of the people inhabiting this greater city, as well as posterity.  That the court should weigh the ultimate effect of the action prayed for can well be appreciated when we realize the powerful and unlimited opportunities the rapid transit commission have for foreclosing the rights, privileges, needs, demands, and necessities, coordinate, to say the least, in every phase and from every standpoint, of all the various governmental agencies and requirements of this municipality. It is well known that at this time a percentage of the children of this city are denied proper schooling by reason of the limited facilities.  What may be said of the limitations that may be entailed upon future generations, if by the supposed necessities of rapid transit the credit of the city should be so impaired as to make it impossible for proper provision to be made for schools, and the other varied municipal needs, such as proper policing, fire service, paving, etc.?  Again, by the adoption of the proposed plan, and the practical monopolizing of all the city's streets, wedded to a single scheme or idea of transit construction or management, the people are practically forever concluded from asserting and exercising a right which has much of reason and argument in its support, to wit, to own and operate their own municipal subways. · It may be that in a year, or a few years, the vast majority of the people of this greater city, in their enlightened judgment, will demand the construction and operation of their own transportation facilities.

"If the court approves the applications now pending, the territory may be so despoiled as to absolutely destroy all possibility for future construction that would in any way become approximately competitive to the interests now

in command of the city's transit facilities. The present plans distinctly disclaim any purpose or desire to definitely fix any one of the proposed routes as final, but seek to commit this court and to estop it for all time from interference, no matter what the intervening interests may be, so that there may be no opportunity for this court to protect the people in the evolution of their municipal developement.

"If it be argued that the rapid transit commission will not undertake to construct all of the proposed routes simultaneously, then it may safely be said that this court should not release its power to guide and direct the subway construction so that the city may have the benefit of competitive lines."

To these might be added another suggestion, which is important to property owners, who, if any of the routes were to be immediately built, would, as an offset against the consequential damages that would result during the period of construction, finally have the benefit of the road when constructed. But to have their property affected by the approval of a route which might never be built, acting, as it would, as a notice to all that the street was appropriated for railroad purposes, would impede the development and improvement of property along its line, which would be an injury with no resulting good. It is frankly conceded by counsel for the rapid transit commissioners that there is no purpose immediately to build all the proposed routes, but that it is necessary that they should all be approved, to the end that the city may be enabled to undertake such as it can find the means to build. This necessarily involves the further concession that the rapid transit commissioners have not finally determined upon the routes to be selected, but they wish the whole subject to be in such shape that as the opportunity presents itself they may take advantage of it. This would appropriate all the streets involved in the proposed routes for an indefinite period; and in view of the ever changing conditions in transit facilities and the probable further progress and development of engineering skill and ingenuity, it is not an improbability to assume the likelihood that a city which has seen in a few years a change from horse cars to cable and then to electric motive power, and to which has been added elevated railroads and, lastly, subway transportation may have in store a system of transit which may be as great an advance as elevated roads and subways are over surface horse railways. This is but expressing the view that, if we are now to appropriate all our streets irrevocably under the present plans, it is possible that, when the city has the financial ability to construct in accordance with those plans, they may then be antiquated and no longer desirable. While the chance, or even the prospect, of future improved methods would not, standing alone, be a reason for withholding approval of routes actually determined to be constructed immediately, it is entitled to consideration before approving of plans irrevocably to be adhered to for routes which, owing to the financial resources of the city, cannot all be initiated or carried out for many years to come.

We have not overlooked the fact that the city's limit of debt-incurring capacity is constantly changing. Nor are we unmindful that, unless the growth of the city is to be seriously retarded, new rapid transit facilities must be furnished in the near future. But, while it is evident that these facilities must be furnished by the construction of subways and tunnels, the city has other demands upon its treasury of a very

pressing nature, including the construction of new schoolhouses and docks, and the opening of new parks, bridges, etc., which will necessarily prevent the exhaustion of its entire borrowing capacity in rapid transit construction. Probably no prudent city administration would deem it wise, in the present condition of its financial affairs, to commit it in the near future to an expenditure for rapid transit exceeding $50,000,000. It therefore follows that, if construction is to be begun upon all of the routes which have been approved by the local authorities about eight-ninths of the cost must be provided by private capital.

Much difference of opinion exists about the effect of the recent amendment to the rapid transit act upon the probability of enlisting private capital in new rapid transit construction, but it is plain that the rapid transit commission cannot offer as attractive terms to bidders under the new law as it was able to offer under the old law. A lease for 20 years, with a possible renewal for 20 more upon terms to be fixed at the expiration of the first period, must be far less attractive to bidders than a lease for 50 years, with a renewal of 25 years upon terms made in advance, making the term offered to bidders practically a 75-year term. Whether private capital can be obtained to any considerable extent under the present law is a question which time only can solve. But it is plainly the duty of the court, under the circumstances, to consider the possibility that an attempt to do so will result in failure. Therefore it becomes the duty of the court to consider, in the interest of the abutting property owners who are represented in this proceeding, as well as in the general interest of the city, whether all the routes presented to the court for approval should be approved, irrespective of the possibility of commencing construction thereon in the near future. If it were possible for the court to determine in advance which routes have the right of way, or, in other words, which routes are the most urgently needed and are most likely to attract private capital, the court might approve of these routes and reject the rest, without prejudice to another application under changed conditions. The difficulty is that there is nothing before us to show a greater need for one route than another, or a greater probability of construction on one route than on another.

During recent years the usefulness and value of vaults and other subsurface structures in streets have greatly increased. In most cases these privileges are held at the pleasure of the city authorities, and the abutting owners must be content to vacate where the city needs the space occupied by them for other and more important uses. But it is one thing to ask them to vacate to make way for a road which is building, and it is another thing to permit an important street to be pre-empted for a road which may not be built during the life of the present generation. Regard being had, therefore, to these different and conflicting interests, we think the right solution, so far as it rests with this court, will be to approve all of the routes conditionally, upon the rapid transit commissioners deciding within two years which of them they have finally concluded to construct. This will enable them, within the period named, in view of the then existing condi-

tion of the city's finances, to determine just what routes should be built; and after that time they should be required, if able to construct other routes, to renew their application to this court. This will render null and void our approval of all routes not selected and contracted for within said two years.

The suggestion, made by a taxpayer in the Third avenue proceeding, that the court should not confirm the report of the commissioners unless the board of rapid transit commissioners file a stipulation to incorporate in the contract for the construction of the proposed subway a clause making the contractor and his sureties liable for all damages to the walls, foundations, or other parts of adjacent buildings or structures, is answered by the fact that the insertion of such a condition at the present time would be premature and is unnecessary for the protection of property owners. It will be noticed by reference to chapter 607, p. 1573, of the Laws of 1906, that section 37 of the rapid transit act (Laws 1891, p. 19, c. 4), is amended so that a public hearing is to be had as to the terms and conditions of the contract, at which citizens shall be entitled to appear and be heard; and by other provisions in that section no contract can be made until the board of estimate and apportionment shall have consented thereto. So that, even if the rapid transit board should insert provisions for the protection of property owners which they may deem unsatisfactory, they will have a further opportunity to be heard before the board of estimate and apportionment. As the act, therefore, seemingly leaves this question as to the terms and conditions of the contract with the proper city authorities, the court should not undertake, in advance of the time when it becomes necessary to make the contract, to impose conditions which might or might not be embarrassing.

There are other objections that have been presented and arguments urged against our approval of the reports; but, for the reasons stated, we think that the reports should be confirmed, subject to the condition and limitation suggested. All concur.