(23 App. Div. 472.)

## In re BOARD OF RAPID-TRANSIT COM'RS.

(Supreme Court, Appellate Division, First Department.   December 17, 1897.)

1. RAPID-TRANSIT COMMISSION—CONFIRMATION OF REPORT.
    Inasmuch as the report of the commissioners appointed by the supreme
    court to pass upon the proposed rapid-transit plans establishes with rea-
    sonable accuracy the cost of construction, and shows the ability to meet
    such cost, provided the position of those commissioners and the rapid-
    transit commissioners in respect to what constitutes the indebtedness of
    the city under the constitution finally prevails, the report should be con-
    firmed, leaving these legal questions to be settled in future.

2. SAME—BOND.
    In view of the magnitude of the undertaking and the vital interest of
    the city in the prompt completion of the road and its effective equipment,
    maintenance, and operation, a stipulation should be filed by the rapid-
    transit commissioners that the penalty of the bond specified in section 34
    of the rapid-transit act will be fixed at not less than $15,000,000.
    Ingraham, J., dissenting.

In the matter of the application of the board of rapid-transit
commissioners.   Motion to confirm report.   Granted.

Argued before VAN BRUNT, P. J., and RUMSEY, WILLIAMS,
PATTERSON, and INGRAHAM, JJ.

A. B. Boardman and E. M. Shepard, for the motion.
George Zabriskie and Cephas Brainard, opposed.

VAN BRUNT, P. J.   The imperious necessity of improved means
of transit in the city of New York has long been recognized.   It
had become so evident that in the year 1893 the people determined
that, as there seemed to be no other means for its accomplishment,
it should be brought into existence even by the pledge of the
credit of the city.   This necessity seems to have addressed itself
so strongly to the people that they considered that the accomplish-
ment of this end should be attained though the ability of the city
to carry on contemplated improvements might be thereby cur-
tailed.   It has been said that the people have not, by their vote,
approved of the plan now presented to the court, but that it was
another scheme, which differed in many of its characteristics from
the plan now under consideration.   I think, however, that a ref-
erence to the history of the rapid-transit enterprise will show that
the people did not give their vote to any particular detail by which
rapid transit was to be obtained, but rather in favor of a result
to be reached in any manner which might be found to be practi-
cable.

The presentation of the plan now before the court, and the
proofs and developments surrounding it, constitute striking evi-
dence of the correctness of the conclusion of this court in con-
demnation of the previous scheme which was submitted to it.
This plan, however, calling, as it does, for an expenditure of from
twenty to forty millions less than the scheme presented to the
court before, still involves grave questions of law as to the pos-
sibility of its completion.   The report of the supreme court com-
missioners concedes, and the arguments of counsel in favor of the
application seem to admit, that, if the total cost of the building

of the proposed rapid-transit road is to be deemed as incurred by the city at the time of the making of the contract, and that, added to this, is all the indebtedness of the city of New York then existing, whether funded or contingent, and its obligation to assume on the 1st of January of the coming year the indebtedness of the adjacent cities and counties as provided by the new charter, the limit of indebtedness will be exceeded. Whether any of these elements can be excluded in determining as to the legality of any contract which the rapid-transit commissioners might make or propose to make for the building of this road, present serious questions of law, which, in my judgment, ought not to be determined upon this application, for the reason that, if the court on this application should come to a conclusion upon these questions adverse to the legality of such proposed contract, no review could be had of its determination, although involving only questions of law. It is stated in the report of the supreme court commissioners that the suggestion that no contract for the construction of the road can be made without ipso facto creating a debt to the full extent of its estimated cost is not reasonable. The question of the reasonableness of a constitutional inhibition is not open to discussion, and an examination of the authorities in this state upon the question of what constitutes indebtedness or debts due may show that this unreasonable proposition has very respectable authority, viz. our court of appeals.

It cannot for a moment be assumed, in considering these questions, that independent and separate contracts of construction with different contractors could, from time to time, be entered into, for the reason that every contract of construction must necessarily embrace a contract for the operation of the line by the constructing contractor, and to have the operation of the rapid-transit system controlled by divers and various operators would, of itself, necessarily, absolutely condemn the scheme. It would seem, therefore, that the contract initiating the work must also contain provisions for its completion and final operation. It is proposed by deferring construction and payment to throw (as it is stated) the indebtedness into future years, and thus obviate the constitutional objection. It is further urged that a considerable amount of the apparent indebtedness of the city of New York is only imaginary, and not real; that, for example, assessment bonds are outstanding, which it is anticipated will in the future be paid by the receipt of assessments for benefit levied upon neighboring property; that lands acquired for Croton aqueduct purposes, which are to be used only for subsurface constructions, may be sold for nearly what was paid for them, and that indebtedness thus reduced; and that the excess of indebtedness of the adjacent cities and counties over the limit provided by the constitution is not to be charged against the city at this time, because the actual assumption has not taken place, although the obligation to assume at present exists. Whether these devices in respect to the contract, and these theories as to the existing indebtedness of the city, will finally obtain, ought to depend upon the decision of our court of last

resort, and should not be determined, as has been already stated, in this proceeding, where they cannot be reviewed.

There are other questions in regard to other species of indebtedness. We know, for instance, little, if anything, from the evidence before us, of the floating indebtedness of the territory which the city of New York is bound to assume on the 1st of January next. These uncertainties may, upon some application in reference to the contract, be cleared up, so that the exact truth in respect thereto may be known. Upon the whole, although it is evident that beyond peradventure the entrance by the city into this enterprise will materially cripple its power to carry on other contemplated improvements (unless the money therefor is produced by immediate taxation), and, although weighty questions of law must necessarily arise as to the legality of any contract which may be entered into for the construction of this road, I think that, as the cost of construction is established with reasonable accuracy, and the ability to meet such cost is shown, provided the position of the supreme court commissioners and the rapid-transit commissioners in respect to what constitutes the indebtedness of the city under the constitution finally prevails, whatever may be our opinion upon those subjects, we should confirm the report of the supreme court commissioners, and allow these legal questions to be settled in the future, particularly as, if it should be determined that the debt limit was exceeded by any contract which the commissioners might make, no liability could possibly be imposed upon the city. Litchfield v. Ballou, 114 U. S. 190, 5 Sup. Ct. 820.

In view of the magnitude of the undertaking which we are asked to approve, and the vital interest which the city has in the prompt completion of the contract for the building of the road when entered into, and its effective equipment, maintenance, and operation, we think that we should, before consummating our confirmation of the report of the supreme court commissioners by the entry of an order to that effect, have some assurance that the powers of the rapid-transit commissioners in respect to security, provided by section 34 of the rapid-transit act for the payment of the rental specified in the contract, and for the faithful performance of all the conditions, covenants, and requirements provided for in the contract, should be exercised so as to protect the interests of the city in a substantial manner; and to that end a stipulation should be filed by the rapid-transit commissioners that the penalty of the bond specified in section 34 of the rapid-transit act will be fixed at not less than $15,000,000. This amount, in view of the large interests of the city involved in its advances of credit for the work as it progresses, is not more than sufficient security to the city in the event of the failure of the contractor to perform his or its contract, and to enable it to carry the road to completion in case the enterprise is thrown on its hands by the default or forfeiture of the contractor.

Upon the filing of the stipulation referred to in the foregoing opinion, an order will be entered upon the usual notice confirming the report of the supreme court commissioners.

RUMSEY, WILLIAMS, and PATTERSON, JJ., concur.

INGRAHAM, J. (dissenting). The question to be determined by this court upon this application is presented on a motion to confirm the report of commissioners who have determined that an underground railroad ought to be constructed upon or under certain streets in the city of New York, notwithstanding the refusal of a majority of the property owners upon such streets to consent thereto. Prior to the year 1874, it was for the legislature to determine whether a road should or should not be built. Whatever the rule had been as to roads or highways where the public had only acquired an easement, it had become the settled law of this state that, where the fee of a street or avenue had been acquired by a municipal corporation to be used as a street or avenue, the legislature had the exclusive power to determine when such street or avenue should be used for the construction and operation of a railway. Neither the municipal corporation, in whom was vested the fee of such street or avenue, nor the owners of property abutting thereon, were required to be consulted as to the construction or operation of such a road. At the general election in 1874, an amendment to the constitution, radically limiting the power of the legislature to grant such franchises, was adopted by the people, and became a part of the fundamental law of the state; and that provision was, in substance, continued in the new constitution, adopted by the people in the year 1895. Const. art. 3, § 18. The legislature was prohibited from passing a private or local bill granting to any corporation, association, or individual the right to lay down railroad tracks, with a further provision that—

"The legislature shall pass general laws providing for the cases enumerated in this section, and for all other cases which, in its judgment, may be provided for by general laws. But no law shall authorize the construction or operation of a street railroad except upon the condition that the consent of the owners of one-half in value of the property bounded on, and the consent also of the local authorities having the control of the portion of a street or highway upon which it is proposed to construct or operate such railroad, be first obtained, or in case the consent of such property owners cannot be obtained, the appellate division of the supreme court, in the department in which it is proposed to be constructed, may, upon application, appoint three commissioners who shall determine, after a hearing of all parties interested, whether such railroad ought to be constructed or operated, and their determination, confirmed by the court, may be taken in lieu of the consent of the property owners."

Here, for the first time, was recognized the right of owners of property upon a street to be consulted before that street should be used for railroad purposes; and the legislature, being prohibited from passing a special law granting that power, was also prohibited from passing a general law under which such right could be acquired, unless there was a provision that the consent of the property owners should be obtained for the use of the streets or avenues for the purpose of such a road. But it was recognized that an occasion might arise when the public interests in the construction and operation of a railroad in certain streets or avenues would be so great as to overshadow the wishes or

whims of the property owners upon the street or avenue as to present a case where the rights of individuals must give way to the public interests, and provision was made in such a case for the appointment of commissioners, who were to hear all the parties interested, take the evidence offered, and determine, after hearing all objections offered for or against the construction of the road, whether it ought to be constructed and operated. As was said by Mr. Justice Rumsey, when the report of the commissioners of 1896 was before the court:

"We are to say whether, upon all the facts made to appear before us, the scheme presented is feasible, and within the limit of the power of the city, and so likely, upon the whole, to be for the benefit of the city, that the railway should be constructed in spite of the refusal of the property owners to give their consent. That consideration involves an examination into the nature of the scheme; the time probably necessary for its construction; the probable cost; whether or not the expense is within the means which the city has at hand to pay; and whether, upon the whole, considering all the advantages and disadvantages presented, the particular scheme is one which it is within the power of the city to carry into effect, having in view other imperative calls upon the city treasury, and which, when carried into effect, will be likely to afford the advantages which are expected from such a construction." In re Rapid-Transit Com'rs, 5 App. Div. 300, 39 N. Y. Supp. 1121.

The commissioners, after hearing the parties interested upon this application, have determined that this road ought to be constructed and operated, and upon us devolves the duty of saying whether that report should be confirmed.

In determining whether a great work should be undertaken, the first question which must be considered is as to the financial ability of those upon whom will fall the obligation of providing the money required, and the power or authority of the contracting parties to make the necessary contracts. Unless there is an affirmative determination of that question, it is the height of folly to attempt to make a contract, or to attempt to proceed with the work. And on this application, considering the nature of the work proposed, and the fact that the municipal corporation of the city of New York is required to make the contract and to furnish the money to pay the cost, we must first consider, in determining this application, as to whether the city has the power to make the proposed contract, and the ability to furnish the necessary money. We have not to determine whether a private individual should be allowed to construct a work, which it is conceded would be of great public utility, out of his private means, and where all that is required for the protection of the public is to see that proper security is given to make it certain that the contract will be completed. There the question of the limit of cost is only material upon a determination as to how much security will be required, or the nature of such security. Where, however, the money is to be furnished by the public, whether by the state or by a municipal corporation, a different question is presented. And this becomes especially important when the state officers or the municipal corporation are limited, either by the constitution or by law, as to the amount of indebtedness that can be imposed upon or incurred by the authority or municipality which is to make the contract or

to be responsible for the cost of the undertaking. It does not seem to me to require argument to show that, if the incurring of such a liability, or the making of such a contract, will involve a liability of a municipal corporation largely in excess of that which the municipality has the power to incur,—in other words, if, because of the fundamental law of the state a contract to build the road, when made by a municipal corporation, would be absolutely void, because such contract would impose upon the municipality a liability in excess of that allowed,—it is the duty of the court to refuse its approval of a report recommending that the road which would require the making of such a contract should be built. If the obligation on the part of the city to pay the amount which is to be paid for the doing of the work is void, it is apparent that the contract never could be performed, and that no advantage would result from the making of the contract, either to the city or to those interested in having the public work completed. A city which has incurred indebtedness to the limit of the amount allowed by the constitution is absolutely helpless to provide means for the payment of any new obligations imposed upon it, except by a resort to taxation; and even this power of taxation is limited by the same section of the constitution which limits the power of municipal corporations to borrow money. The liability of the municipal corporation to creditors, whether upon binding contracts and obligations of the city, or upon claims against the city which arise from the neglect of its agents in the performance of their duties, or whether imposed upon the city in any other manner, still exists, and those obligations must be met, or the city itself becomes bankrupt; and its whole taxing power must be used to supply the money necessary to meet such obligations, imposing upon all the property of the city burdens appalling to contemplate, and for which no advantage derived from means of communication between different parts of the city could possibly be a compensation.

Providing that the city had power to contract, the construction of this railroad would impose upon the city, not only the cost specified in the contract, but other indefinite and uncertain liabilities, the amount of which no one has attempted to estimate, and which, it seems to me, cannot be ascertained until after the road is built and in operation. Thus, by section 34 of this act (chapter 4, Laws 1891, as amended by chapters 528, 752, Laws 1894, and by chapter 519, Laws 1895), it is provided:

"Such contract shall further provide by proper stipulations and covenants on the part of the said city, that the said city shall secure and assure to the contractor, so long as the contractor shall perform the stipulations of the contract, the right to construct and to operate the road as prescribed in the contract, free of all right, claim, or other interference, whether by injunction, suit for damages or otherwise, on the part of any owner, abutting owner, or other person."

By section 37 of the act, amended as aforesaid, it is provided:

"For the purpose of providing the necessary means for such construction at the public expense of any such road or roads, and the necessary means to pay for lands, property, rights, terms, privileges and easements, whether of owners, abutting owners, or others, which shall be acquired by the city

49 N.Y.S.—5

for the purposes of the construction or the operation of such road or roads as hereinafter provided, and of meeting the interest on the bonds in this section hereinafter provided for accruing thereon prior to the completion and readiness for operation of the portion of such road or roads for the construction of which such bonds shall have been respectively issued, the board of·estimate and apportionment, or other local authority in said city in which such road or roads are to be constructed, having power to make appropriations of money to be raised by taxation therein, from time to time, and as the same shall be necessary, and upon the requisition of said board of rapid transit commissioners, shall direct the comptroller, or other chief financial officer of said city, and it shall thereupon become his duty, to issue the bonds of said city."

This liability to be imposed upon the city by the contract to be made by the rapid-transit railroad commissioners is without limit as to amount. Just what are the rights of the owners of property abutting upon a street or avenue, the fee in and to the soil underneath the surface of which has been acquired by the city of New York, so far as the same is not required for the ordinary city uses of gas or water pipes, or others of a like character, has never been finally determined. We have now the example of the elevated railroad, constructed and operated in the city of New York under legislative and municipal authority for nearly 20 years, which has been compelled to pay many millions of dollars to abutting property owners for the easement in the public streets appropriated by the construction and maintenance of the road; and still the amount that the road will have to pay is not ascertained. What liabilities will be imposed upon the city under this contract, what injury the construction and operation of this road will cause to abutting property, and what easements and rights will have to be acquired before the road can be legally constructed and operated, it is impossible now to ascertain. Yet these charges must be met by the city; and, if the city has no power to borrow money to pay them, it must either realize the money necessary from taxation, or default in the payment of its obligations. It seems to me clear that, to justify our approval of the construction of this road by the city, we are bound to inquire as to the effect of the imposition upon the city of the obligations which will be created by the execution of this contract upon the general financial condition of the city; and, if there is any serious doubt as to the power of the city to provide money to meet the obligations which will be imposed by the contract, together with the money necessary to provide for the efficient government of the city, it is our duty to refuse our consent. With whatever regret we may be compelled to stop an improvement which is one ardently desired, the duty imposed upon us is one which we must perform by a conscientious exercise of judgment, regardless of consequences.

It is well here to call attention to the fact that the situation has materially changed since this act was passed by the legislature, and since the people of the present city of New York voted in favor of the construction of this road by the municipality. Since that time, what has been known as the "Greater New York Charter" has been passed, creating a new municipality, upon which

will devolve the responsibility of providing the means for the construction of this road, and necessary to meet all the engagements imposed upon the city by the contract to be executed by the rapid-transit commissioners.  By the charter of this new municipality, which takes effect January 1, 1898, there is created a greater city, in which are united the present city of New York and a territory largely exceeding that of the present city.  Such new city is declared by the first section of the Greater New York charter to be "the successor corporation in law and in fact of all the municipal and public corporations united and consolidated as aforesaid, with all their lawful rights and powers, and subject to all their lawful obligations, without diminution or enlargement except as herein otherwise specially provided."  By section 4 of this charter it is provided:

"All valid and lawful charges and liabilities now existing against any of the municipal or public corporations or parts thereof which by this act are made part of the corporation of the city of New York, including the county of Kings and the county of Richmond, or which may hereafter arise or accrue against such municipal and public corporations or parts thereof, including the said counties of Kings and Richmond, which but for this act would be valid and lawful charges or liabilities against the same, shall be deemed and taken to be like charges against or liabilities of the said city of New York, and shall accordingly be defrayed and answered unto by it to the same extent and no further than the said several constituent corporations would have been bound if this act had not been passed.  All bonds, stocks, contracts and obligations of the said municipal and public corporations, including the county of Kings and the county of Richmond, and such proportion of the debt of the county of Queens and of the town of Hempstead as shall be ascertained as hereinafter prescribed, which now exist as legal obligations, shall be deemed like obligations of the city of New York, and all such obligations as are authorized or required to be hereafter issued or entered into, shall be issued or entered into by and in the name of the corporation of the city of New York."

By section 5, of the said charter it is provided:

"All the valid debts of the municipal and public corporations mentioned in the first section of this act, including the county of Kings and the county of Richmond, and the proportion of the debt of the county of Queens and of the town of Hempstead aforesaid, and the valid debts of the towns, incorporated villages and school districts united and consolidated with the corporation heretofore known as the mayor, aldermen and commonalty of the city of New York, into the city of New York, as well as the debts of the latter corporation, shall be the common debt of the city of New York as hereby constituted.  * * *  It being the intent hereof that the obligations and liabilities of the city of New York as the successor of municipalities and public corporations consolidated into it shall be the same as and not otherwise or greater than the respective obligations and liabilities of the several constituent corporations, and that the city of New York shall succeed to all of their rights as well as to their obligations and liabilities in respect thereof, except as herein otherwise specially provided."

And by section 8 of the act it is provided:

"In consideration of the foregoing provisions, whereby the city of New York as hereby constituted, assumes as aforesaid the valid debts, obligations and liabilities of the municipal and public corporations, including the counties, towns, incorporated villages and school districts as aforesaid, and to carry out the scheme and purpose of this act, all of the public buildings, institutions, public parks, water works, and property of every character and description, whether of a public or private nature, heretofore owned and controlled by any of the said municipal and public corporations or parts

thereof, hereby consolidated into the city of New York, including any and all such property owned by the county of New York, the county of Kings and the county of Richmond, wherever situated, and by the county of Queens situated in that portion thereof which is included within the limits of the city of New York as constituted by this act, and all the rights, title and interest of the said municipal and public corporations and counties as aforesaid, or any of them, in and to such property, are hereby vested in the city of New York and divested out of the said corporations and counties, and the power of said municipal and public corporations of the said counties of New York, Kings and Richmond to become indebted, shall cease upon the consummation and taking effect of the consolidation herein provided for."

We have, therefore, on the 1st day of January, 1898, a public municipal corporation to come into existence, upon which is imposed the liability of all indebtedness and obligations of the various counties, municipalities, towns, and villages of the territory therein incorporated; and in consideration of the imposition of these liabilities upon the new municipal corporation the right of the people in the various portions embraced within the limits to conduct their own affairs, and to dispose of the property of the corporations formerly existing, is taken away, and vested in the new municipal corporation. So far as this new municipal corporation is affected, this act imposes upon it the obligations and indebtedness of these various existing corporations and municipalities; and the liability of the new city for any contract or obligation made by either of the cities or municipal or other corporations embraced within the territory of the greater city must be limited by the power of this greater city to assume such obligations, or by the power of the legislature to impose them upon the new city on the 1st day of January, 1898, when this consolidation goes into effect. The people of the state have expressly limited the right of municipal corporations to incur indebtedness, as they have limited the right of the legislature to impose indebtedness upon them. "No county or city shall be allowed to become indebted for any purpose or in any manner to an amount which, including existing indebtedness, shall exceed ten per centum of the assessed valuation of the real estate of such county or city subject to taxation." Const. art. 8, § 10. It is difficult to conceive of a more absolute prohibition of indebtedness above the limit named than is provided for by this section of the constitution. No city or county is to be allowed to become indebted for any purpose, or in any manner, to an amount which, including existing indebtedness, shall exceed 10 per cent. of the assessed valuation of the real estate of such county or city subject to taxation; and all indebtedness in excess of such limitation, except as it existed at the time of the adoption of that provision, "shall be absolutely void." Thus neither the legislature nor the officers of the municipal corporation, nor the people residing in such county or municipal corporation, in their corporate capacity, could make any obligation or incur any indebtedness that could be binding upon the municipal corporation, when such obligation carried the total indebtedness of the city above the limit imposed; and the only exception recognized by the section is that it shall not be construed to prevent the issuing of certificates of indebtedness or revenue bonds issued in anticipation of the collection of taxes for amounts actually contained or to be contained in the taxes for the year when such certifi-

cates or revenue bonds are issued, and payable out of such taxes, nor to prevent the issue of bonds to provide for the supply of water. In order, however, that there should be no evasion of the prohibition by the issuance of such certificates in anticipation of taxes or obligations for a water supply, it was provided that all such certificates and indebtedness not retired within five years after their date of issue, bonds issued to provide for the supply of water, and any indebtedness incurred by any portion or part of a city, should be included in ascertaining the power of the city to become otherwise indebted. Thus, under the express provisions of this article, when this charter takes effect, all certificates of indebtedness issued in anticipation of the payment of taxes which have not been retired within five years after their date, and any debt incurred by any portion of the greater city to provide for a supply of water, and any debt incurred by any portion or part of the city for any purpose, shall be included in ascertaining the power of the new city to become otherwise indebted. What is meant by the term "indebtedness" as contained in this provision of the constitution? "Ordinarily, it imports a sum of money arising upon a contract express or implied. In its more general sense, it is defined to be that which is due from one person to another, whether money, goods, or services; that which one person is bound to pay or perform to another." 5 Am. & Eng. Enc. Law, 143. In construing the meaning to be given to such a term as "indebtedness" in the constitution, we must consider the object sought to be attained by this provision of the constitution under consideration. "The mischief to be prevented was the creation of an excessive debt for local improvements, or public works, or the loaning of municipal credit, so payable that the burden should not fall upon those who contracted the obligations, or on their revenues, but on posterity." Bank v. Grace, 102 N. Y. 318, 7 N. E. 162. Here we have a provision for the purpose of preventing either a municipal corporation or the legislature from incurring indebtedness beyond a certain limit. Is it not clear that such provision could only be effectual by construing the term "indebtedness" to mean any obligation or liability required to be discharged by the payment of a sum of money? This word "indebtedness" has received its construction by the supreme court of the United States in the case of Litchfield v. Ballou, 114 U. S. 190, 5 Sup. Ct. 820. It seems that in the constitution of the state of Illinois (article 9, § 12), there is a provision that "no county, city, township, school district or other municipal corporation, shall be allowed to become indebted in any manner, or for any purpose, to an amount, including existing indebtedness, in the aggregate exceeding five per centum on the value of the taxable property therein"; the language being almost identical with that in use in the constitution of this state now under consideration. The supreme court of the United States, in construing this provision, says:

"It [the city] shall not become indebted; shall not incur any pecuniary liability. It shall not do this in any manner,—neither by bonds, nor notes, nor by express or implied promises. Nor shall it be done for any purpose, no matter how urgent, how useful, how unanimous the wish. There stands the existing indebtedness to a given amount in relation to the sources of payment as an impassable obstacle to the creation of any further debt in any manner,

or for any purpose whatever. If this prohibition is worth anything, it is as effectual against the implied as the express promise, and is as binding in a court of chancery as a court of law."

In the case of Berlin Iron Bridge Co. v. City of San Antonio, 62 Fed. 882, the same construction was given to the provision of the constitution of the state of Texas, and it was held that a contract to build a bridge, made by a city, by which the defendant obligated itself to pay a sum of money for the building of such bridge, created a debt, and that such contract was not binding upon the city, being prohibited by the constitution of the state of Texas, which provided that no debt shall ever at any time be created by any city, except upon certain conditions, which were not complied with in the execution of the contract in question.

The same question was presented again in the supreme court of the United States in the case of Lake Co. v. Rollins, 130 U. S. 662, 9 Sup. Ct. 651. There it was held that a prohibition contained in the constitution, whereby no county should contract any debt by loan, in any form, except for certain purposes, was in fact a limitation upon the power of the county to contract any and all indebtedness. And the same principle has been applied in construing the provisions of the constitution of the state of Illinois (see City of Springfield v. Edwards, 84 Ill. 626; Prince v. City of Quincy, 105 Ill. 138, 215; Id., 128 Ill. 443, 21 N. E. 768; Culbertson v. City of Fulton, 127 Ill. 30, 18 N. E. 781), and also by the supreme court of Iowa in the case of Grant v. City of Davenport, 36 Iowa, 396, and City of Council Bluffs v. Stewart, 51 Iowa, 385, 1 N. W. 628.

In the case of Leggett v. Bank, 24 N. Y. 284, it was held that the words "debt due" included the contingent obligation of an indorser of a promissory note held by a bank, although the note itself was not due, and the liability of the indorser was only contingent upon the failure of the maker of the note to pay it. The court was unanimously of the opinion that the words "debt due" would include an obligation that existed, although it was contingent, and not payable until a future time. Judge Story, in the case of Carver v. Manufacturing Co., 2 Story, 450, Fed. Cas. No. 2,485, says:

"It seems clear that in common parlance, as well as in law, the term [indebtedness] is, in an enlarged sense, sometimes used to denote any kind of a just demand."

In Smith v. City of Newburgh, 77 N. Y. 132, a statute (Laws 1867, c. 88, § 5) was under consideration which gave certain power to the water commissioners of the city of Newburgh to acquire water for a water supply, but provided that, if the said commissioners "at any time deem that the interests of said city call for and require the expenditure of money exceeding the sum of ten thousand dollars, in enlarging, altering and improving the water works of said city, or for any of the purposes of this act, before any such enlargement or improvement shall be entered upon, or any contract or purchase relating thereto shall be made," the same should be affirmed at a special election, to be held in the manner provided for by the act in question. The water commissioners of the city of Newburgh leased a parcel of land for a term of 20 years at an annual rent of $1,500 for the first 10

years, and $2,100 for the next 10 years, payable semiannually, with the privilege of the city to purchase the property at $30,000 at any time during the term.    It was held that the lease was void, as the obligation exceeded the sum of $10,000, and was not authorized by the vote of the taxpayers provided for by the statute.    Miller, J., in delivering the opinion of the court, says:

"The rents in all would amount to $36,000; the purchase price, if made at any time during the term, to $30,000; so that in no contingency was a less sum than $10,000 to be paid by the city.    That the rent was distributed for a long period of time, and to be paid semiannually, did not lessen the amount. The whole liability was incurred upon the execution of the lease, and the common council undertook to bind the city for an amount exceeding $10,000, in direct violation of section 5, last cited."

It was further held that no subsequent ratification of an illegal act can bind a corporate municipality where a contract is unlawful when it is made, and that no subsequent act could make the contract effectual.

Would the city of New York, upon executing this contract to pay $35,000,000 at various times within five years from the date of the contract, become indebted for any purpose or in any manner?    I think it clear that it would.    The indebtedness would not be immediately payable.    It might be a liability which would be contingent upon the contractor's complying with his contract; but it is clear that it would be an obligation upon the city on the date when the contract was executed, payable, it is true, at certain specified times in the future, but still an existing obligation of the city to pay that sum upon the contractor's completing the work as called for by the contract.    And is not such a liability or obligation to pay just as much an indebtedness as if evidenced by a bond payable 20 years from date?    This provision of the constitution would be of no effect in limiting the power of a city to incur indebtedness, unless this meaning were given to the word "indebtedness."    I think, therefore, that no contract can be made, or obligation entered into, or liability incurred, by any municipal corporation in this state, calling for the payment of a sum of money which, with existing debts, obligations, or liabilities of every kind and description, will impose upon the municipal corporation an obligation to pay, either at present or in the future, an aggregate sum of money exceeding 10 per cent. of the assessed valuation of the real estate subject to taxation embraced within the limits of such municipal corporation at the time the contract or obligation is made or assumed; and that the new city of New York will have no power to make any contract or obligation which will or can increase its debt above this limit.

As before stated, the obligation upon the city of New York, under the contract that these rapid-transit commissioners must make to build this railroad, is, to some extent, most indefinite.    It will have to pay the amount provided for in the contract for the building of the road.    What that amount will be no one can tell until the contracts are made.    We have the opinion of the engineers, which is confirmed by that of the commissioners, that the railroad can be built for $35,000,000.    But whether contractors can be found to build it for that amount does not appear.    Assuming, however, that a contractor can

be found who will build the road for that amount, the obligations to
be imposed upon the city of New York are not confined to the specific
amount to be paid to the contractor, but, in addition, the city is to be
compelled to acquire all real estate that the board of rapid-transit
commissioners shall determine to be necessary for the purpose of con-
structing or operating the road, "including necessary stations and
station approaches, or for the purpose of operating or securing the
operation of the same free of interference and right of interference,
and of action and right of action for damages or otherwise, whether
by absolute owners or others, or to provide, lay, or maintain conduits,
pipes, ways, or other means for the transmission of electricity, steam,
water, air, or other source or means of power, or of signals or messages
necessary or convenient for or in the construction or operation of
such road, or for the transportation of materials necessary for such
construction or operation, or to provide a temporary or permanent
way or course for any such conduit, pipe, or other means or source
of transportation." Laws 1894. c. 752, as amended by Laws 1895, c.
519, §§ 15, 18, 20. And, in addition to the amount necessary to ac-
quire such land, the city is at all times to guaranty the contractor free
from any obligation by unauthorized suit for damage, or otherwise, on
the part of any owner or abutting owner or other person that would·
prevent him from operating the said road as constructed under the
contract. The amount of this contingent liability imposed upon the
city, in addition to the amount required to be paid for the construc-
tion of the road, is incapable of being definitely ascertained, and no
reasonable estimate can be made as to its amount. But the city will
be required to pay therefor. Laws 1895, c. 519, § 20. Accepting,
therefore, the report of the commissioners that the road as proposed,
and of which our approval is asked, can be built for the sum of $35,000,-
000, there will be imposed upon the city, in addition, the amount
that will be needed for stations and other real estate acquired in fee,
and also the amount necessary to acquire the easements of those
whose property will be injured by the construction and operation or
maintenance of the road; and upon the execution of the contract these
various sums will become an existing indebtedness of the city and
county of New York, and as such will be imposed upon the new cor-
poration to come into being upon the 1st day of January, 1898.

The question then comes, would such an indebtedness, taken
with the indebtedness which must be assumed by the said new
municipal corporation, be in excess of that for which such new
corporation can become indebted, under the provisions of the con-
stitution before cited? In discussing the amount of the indebted-
ness which under the new charter will be imposed upon the new
city of New York, we must bear in mind that it is impossible to
ascertain the full amount of the obligations of the various mu-
nicipal corporations, counties, and other political subdivisions in-
cluded within the territory which will constitute the new city.
There is nothing before us to show what obligations or liabilities,
absolute or contingent, have been incurred by these various mu-
nicipalities and corporations. There was before the commission-
ers evidence as to certain existing obligations and liabilities,

which, under the provisions of the new charter would become obligations or indebtedness of the new city; but it is clear that there are obligations and liabilities other than those specified. It is also clear that the prohibition of the constitution against indebtedness is entirely irrespective of the resources of the municipality to pay such indebtedness. An amount of money which a municipal corporation is bound to pay is not any the less an indebtedness because it is to be paid in return for property to be transferred or acquired by the corporation which will produce a revenue for the corporation. There can be no doubt that the city of New York, with its sinking fund for the payment of principal and interest of its debts, and its power of taxation, will be able to pay, as they become due, all of its obligations or indebtedness. But a debt that a corporation or an individual is bound to pay is no less a debt or obligation because such person or corporation has the means to pay the debt when it becomes due; and, where a municipal corporation is prohibited from incurring a debt, it is as much prohibited from incurring one which it can pay as one which it cannot pay. The constitution says that the city of New York shall not be allowed to incur any indebtedness exceeding the limit fixed, and that any indebtedness, exceeding that limit, assumed or attempted to be imposed upon such corporation, shall be absolutely void. It is not at all material, as to the power of a corporation to enter into a contract by which it obligates itself in the future to pay a sum of money, to show that in the future, relying upon the growth of the city and the increase in the value of assessments, when that sum of money becomes due the limit will be so raised that it would then be able to incur the indebtedness. The prohibition applies to the present time, and prevents the creation of an obligation to pay in the future a sum of money, when, by such an obligation, the total amount of its indebtedness exceeds 10 per cent. of the assessed valuation of the real estate included within the corporate limits subject to taxation at the time when the indebtedness was sought to be incurred. The opinion of the comptroller and the finding of the commission that within the next few years the present city of New York would, if it continued to exist, be able to incur an indebtedness of $135,000,000 without exceeding the constitutional limit, are no answer to the objection that by the last assessment of property subject to taxation within the city the proposed contract would increase the indebtedness above 10 per cent. of such assessed value of taxable property. Nor are we justified in eliminating all present contracts and obligations of these municipalities which have been entered into, and which will call for the payment of large sums of money for public improvements now under way. Such contracts and obligations are present liabilities of the city payable in the future, and constitute indebtedness of the city as much as this present contract would be an indebtedness if it were executed. What we must do is to ascertain what the indebtedness of the new city of New York will be on January 1, 1898, and then determine whether or not this proposed increase of indebtedness will be valid within the constitu-

tional prohibition; and, unless we can see that such a contract would not increase the debt to such an extent as to bring the total debt of the city in excess of the requirements of the constitution, I think it is our duty to say that this road should not now be built.

The consolidated stock and certificates of indebtedness of the present city of New York, deducting the certificates of indebtedness issued in anticipation of taxes, and the gross amount of the obligations of the city held by the sinking fund, the net funded debt on August 31, 1897, appears to have been $130,412,895. In addition to that, it appears from the testimony of the comptroller that balances due or to grow due upon contracts for public improvements made by the city of New York unpaid on August 31, 1897, amount in the aggregate to the sum of $20,185,675.80. There must be further added to the obligations of the city the amount which the city will be compelled to pay for a large amount of real estate taken by the city, most of which has actually been taken possession of, and the value of which is now being determined. The evidence as to the value of this property is, of course, indefinite, and the actual amount that the city will be required to pay is not easily to be ascertained. The commissioners, in their report, estimate the amount to be $10,000,000, but it would seem that the amount which the city will have to pay will be much larger than that, and will undoubtedly exceed $20,000,000. We have thus for these three items an aggregate city debt of about $170,000,000. It appears, however, that the city has on hand, as the proceeds of bonds sold, and which it is claimed is included in the amount stated as due on account of these contracts and this obligation for lands taken by the city, and also in the amount of the funded debt, the sum of $9,901,763.49. Assuming that this should be deducted from the aggregate amount of indebtedness shown, there is a total indebtedness of $160,695,808.31. In addition to this total existing debt, which is clearly a present existing liability of the city, as appears from the testimony of the comptroller, there are bonds and stocks of the city which had been authorized by the board of apportionment and other city authorities, and on August 31, 1897, he was required to sell an aggregate of $16,038,792.50. How far these bonds have been issued does not appear. Under the law as it then stood, however, these bonds or obligations were required to be issued, and the proceeds applied to the purposes specified, and the comptroller could be compelled by judicial proceeding to sell such obligations for the purposes specified; and from a description of the objects for which the bonds were to be issued it seems that a large portion, if not all, of this sum is required to meet actual existing obligations of the city, which will have to be met by money procured in some way by the city. It also appears that there are other liabilities for the opening of streets, proceedings to acquire the title to which are now pending, liabilities of the city upon claims made against it for damages sustained in consequence of the closing of streets, and other like claims, which aggregate several millions of dollars. Leaving out of consideration, however, these liabilities of the city, which are somewhat indefinite,

and the amount of which it is impossible to fix, we have, as before stated, upon the three items of indebtedness specified, after deducting the amount of money held by the city, realized from the sale of bonds, which is included in the indebtedness, and which will be applicable to the payment of the amount due upon the contract or other obligations specified, a total net debt of the city of New York of $160,695,306.31. Ten per cent. of the assessed valuation of the real estate of the present city subject to taxation is $187,708,679. Deducting the total debts as above indicated of $160,695,306.31, shows that the present city has no power to incur an indebtedness in excess of $27,000,000; and that is without considering any of the liabilities above specified, the amount of which cannot be accurately determined from the evidence before us, but which evidently imposes upon the city liability for a large amount.

As before stated, we are not now concerned with the amount of property which the city has wherewith to pay its indebtedness, or the money it will receive which is applicable to that purpose. Indebtedness has no relation to the assets of the debtor. A debtor's assets have relation to his solvency or ability to pay his debts; but, no matter what the assets of a municipal corporation may be, no matter what its resources, the value of its property, or the amount on hand applicable to the payment of the indebtedness, its indebtedness is what it owes,—what it can be compelled to pay to creditors; and, when a municipal corporation is restricted by law as to the amount of debts which it may incur, that restriction is not affected by the fact that it has or will have assets sufficient to pay its debts. The constitution declares any indebtedness incurred in excess of the limit imposed by law absolutely void, no matter what the financial condition of the city, no matter what its resources, no matter what its power of payment.

It is hardly necessary to discuss the claim by the counsel for the commissioners that, if the city found itself without means to pay for this rapid-transit road, it can sell its parks and school houses, police-station houses, and property used for its fire department; for, even assuming that it would be for the advantage of the city to destroy the public parks, abandon the police and fire departments, and its system of free education, it is by law required to provide this machinery for the government of the city, and these parks and schools for the well-being of its inhabitants.

We have now considered the amount of the debts of the present city of New York, and have seen that, assuming that the report of the commissioners is correct as to the cost of this proposed road, an indebtedness for such cost would exceed the present power of the city to incur indebtedness. Turning to the condition of affairs upon the consolidation which will take place upon the 1st of January, 1898, it appears that the amount of indebtedness which the new city can incur will be considerably less than the amount which the present city of New York can become indebted for. It is impossible to ascertain from the evidence before the commissioners just what the indebtedness of the new city will be. It is

conceded, however, that the city of Brooklyn has reached the limit, and has no power to incur any additional indebtedness. In addition to this, the debt of the county of Kings, which exceeds $14,-000,000, becomes a part of the indebtedness of the new city, and all the debts of Richmond county, and the various towns and villages in that county, a portion of the debt of Queens county, and the debts of the various municipalities, towns, and villages in Queens county embraced within the new city of New York, are to be assumed by the new city. Considering the funded debt of the territory embraced within the new city of New York, without counting the other liabilities of the counties, cities, towns, and villages, we then find that the total assessed valuation of real property within that limit subject to taxation amounts in the aggregate to $244,814,979. The funded debt of the city of New York is $130,412,895; the funded debt of the city of Brooklyn is $56,965,-593; the funded debt of the county of Kings and towns annexed to Brooklyn is $18,701,508; the debt of the county of Richmond and of the towns and villages therein is $3,082,660; and the debt of the county of Queens and of the cities and towns therein annexed aggregates $11,328,754,—making a total aggregate of $220,-491,410. This amount deducted from that for which the new city of New York can become indebted, leaves a balance of $24,323,569; and this balance, as above stated, is without considering any of the liabilities upon contracts executed before January 1, 1898, and for property taken for public use, and allowing nothing for any of the various claims that have been made against the several cities and municipalities within the greater city of New York. The amount of legal liability of the present city of New York, outside of its funded debt, is much more than this amount. It is clear that, in addition to the present indebtedness of the existing counties and municipal corporations of the amount called for by such a contract as is contemplated for the building of this road, would make the obligation of the Greater New York far in excess of the amount of indebtedness which the legislature could impose upon the new city under the provisions of the constitution before cited. By the Greater New York charter a new municipal corporation is created, and by the act creating it a liability is imposed upon the corporation thus created. It seems clear that any act of the legislature imposing upon such new municipality an indebtedness in excess of 10 per cent. of the value of real property as assessed for taxation within the boundaries of the new city would be absolutely void, and would impose no obligation or liability upon the new city. By the act itself the old municipalities are destroyed. Their officers have either ceased to be officers in consequence of the expiration of their terms, or are, by the new charter, legislated out of office; and no representatives of old municipal corporations will exist after January 1, 1898.

If the act of the legislature imposing a liability for these obligations upon the new municipal corporation, because of the fact that such liabilities exceed 10 per cent. of the value of real estate as assessed for taxation, is void, a situation is created which certain-

ly is most serious, the consequences of which it is impossible to conceive. Just what effect it would have upon the new charter, upon the validity of the whole scheme consolidating these cities, upon the liability of the several cities, towns, and villages embraced within it, or upon the rights of creditors and bondholders, is most uncertain. But certainly the situation as suggested, considering the enormous interests involved, the enormous amount of property in question, and the confusion that would necessarily result from any doubt about the responsibility of the city, should make any public official upon whom rests the responsibility of determining whether or not a new obligation should be created hesitate before approving the imposition of such a new obligation. I have come to the conclusion that the city of New York, as at present constituted, and the new city which will come into being on January 1, 1898, have no power to make a contract involving the payment of a sum of money which would be sufficient to construct this road; that such a contract would be in direct violation of the provisions of the constitution, and would be absolutely void. If this is so, it seems to me clearly to follow that this court should not approve the building of this road, and that the report of the commissioners should not be confirmed. With a sincere desire to approve of this report,—a sincere desire to enable the means of rapid transit to be provided for the city of New York, which is ardently desired, and which is conceded to be so necessary for the future development of the city,—I have been confronted by this provision of the constitution, which, in my mind, is an absolute bar to the contraction of an obligation for the payment of this sum of money by the city of New York to accomplish that purpose. It is needless to say that courts of law are bound to administer the law as they find it, and, regardless of consequences, are bound to enforce the provisions of the constitution. For this court to approve a plan which would involve a violation of a constitutional provision by a municipality upon the principle urged by the counsel for the commissioners, that, if this is true, no one will make a contract with the city, or because, if such a contract would be void, that question could be determined in some other proceeding, and some other court could stop the making of the contract or the building of the road, would be an evasion by this court of the duty imposed upon it by the constitution, and a refusal of the court to perform such duty. The constitution and laws of this state have imposed upon this court the obligation to determine whether this road should be built. In the performance of its duty, the court must be satisfied that the road should be built by the city of New York under the conditions which were found to exist when the application for the approval was made. We cannot delegate the obligation of determining that question to any other tribunal. We can no more avoid the responsibility of making such a determination than we can relieve ourselves from the responsibility of determining any other question submitted, or justify a wrong determination of any question when it is inconvenient or disagreeable to perform the duty, upon the ground that an appellate court ex-

ists, which will correct an erroneous decision of the question submitted to the court. The constitution has not imposed this duty upon the court of appeals, nor upon any other court or tribunal. If the execution of this proposed contract by the city of New York is illegal, or if the contract is one which the city officials cannot make, and this plainly appears from the facts before us, and we still approve of it, so that the contract may be made, notwithstanding that its invalidity when made is conceded, it seems to me to be a plain violation by the court of its duty, and a refusal by the court to enforce the constitution of this state,—a duty which is expressly imposed upon every judge when he accepts the trust imposed upon him by the people. I am satisfied that, upon this record, a contract made by the city of New York to build this road, by which the city undertakes to pay the cost, would impose upon the city an indebtedness in excess of that allowed by the provisions of the constitution; that the contract would be absolutely void in its inception, and could never result in the building of any road called for by the plan before the commissioners; and that the making of such a contract, or the attempt to build the road under its provisions, would result in nothing but disaster to the city of New York, and to the property owners along the line of the road. For these reasons, in my opinion, the report of the commissioners should not be confirmed.